UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARY F. MEYERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:14-cv-00973-SEB-DML |
| | ) | |
| INDIANAPOLIS PUBLIC SCHOOLS | ) | |
| BOARD OF SCHOOL | ) | |
| COMMISSIONERS of the city of | ) | |
| Indianapolis, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant Indianapolis Public Schools Board of

School Commissioners' ("IPS") Motion for Summary Judgment [Docket No. 93], filed

on October 10, 2016.[1] For the reasons detailed below, Defendant's motion is <u>GRANTED</u>.

**<u>Factual Background</u>**

**Plaintiff's Employment at IPS**

Plaintiff Mary F. Meyers began working for IPS as a support team member in

2003 and remained in that position through 2006. After earning her Master's Degree in

---

[1] Defendant originally filed its motion for summary judgment on November 23, 2015 [Dkt. No. 71].
However, on September 9, 2016, the Court stayed that motion pending the filing of a revised motion and
accompanying briefing responsive to the Seventh Circuit's decision in *Ortiz v. Werner Enters., Inc.*, 832
F.3d 760 (7th Cir. 2016). We have before us now that revised motion.

Education, Ms. Meyers transitioned into a new role in 2008 teaching English as a Second Language ("ESL"). She was initially assigned to School #81 for the 2008–2009 school year, but due to School #81's closure, she was reassigned the following year to School #79, where she remained until the spring of 2012. While employed at School #79, Ms. Meyers reported to Principal Joyce Akridge. At Ms. Meyers's request, she was reassigned from School #79 to School #105 at the beginning of the 2012–2013 school year, where she remained until her teaching contract was cancelled by the IPS in November 2013. While employed at School #105, Ms. Meyers reported to Principal Paula Peterson.

**Timeline of Events**

The following chronological timeline sets out the events that led up to the cancellation of Ms. Meyers's teaching contract with IPS, including when she requested accommodations under the Americans with Disabilities Act ("ADA") and leave under the Family and Medical Leave Act ("FMLA").

**May 9, 2011:** Due to her ongoing physical limitations related to a prior ankle surgery, Ms. Meyers requested and was granted a "Section 504" ADA conference to discuss possible accommodations to assist her in continuing her employment with IPS. During this conference, the parties discussed possible accommodations, including handicapped parking, the assignment of alternative duties in place of lunch duty, excusal from field trips that require walking or standing, limited stair climbing, and reassignment to either a one-story school building or a school with an

2

elevator. However, apparently without disagreement, Ms. Meyers and IPS acknowledged that the "504 process" could not be completed or fully implemented due to "insufficient information" in time for Ms. Meyers's school assignment for the 2011–2012 school year, so implementation of the proposed accommodations was delayed with an agreement to reconvene the following year to address any issues that might arise.

**September 6, 2011:** Principal Akridge assigned Ms. Meyers a bi-weekly, thirty-minute lunch duty. Ms. Meyers responded that she was unable to perform this duty, given her inability to stand for the requisite thirty-minute time period. Ms. Meyers informed Principal Akridge that this issue had been resolved by the parties' Section 504 conference of May 9, 2011. Principal Akridge remarked that she (Akridge) had performed lunch duty herself, notwithstanding her pain from standing for thirty minutes due to spinal stenosis. Akridge also asked Ms. Meyers: "Please show me in your paperwork w[h]ere it states that you are not required to have duty. Also, how can you circulate the classroom if you cannot stand for longer than five minutes? Our job requires us to move about in the classroom…" Dkt. 95-1 at 83.

**October 10, 2011:** Ms. Meyers requested intermittent leave under the FMLA for severe arthritis and psoriasis for a period beginning on October 10, 2011 and continuing through June 12, 2012 (essentially the full school year). This request was approved on October 13, 2011. Ms. Meyers's leave allowed her to attend regular

doctors' appointments as needed throughout the school year. See Dkt. 93-2 at 17–22.

**October 12, 2011:** One day prior to the issuance of the FMLA approval, Principal Akridge assigned Ms. Meyers responsibility for circulating a monthly cultural competency newsletter and selecting a cultural competency article for the staff to read. Dkt. 95-1 at 85.

**November 28, 2011:** The parties convened for their second Section 504 conference to discuss possible accommodations for Ms. Meyers's inability to stand for more than five to ten minutes at a time. During this conference, the parties agreed that Ms. Meyers would be permitted to use a chair as needed during her shifts on "breakfast duty" and would be given alternative assignments in the school building in exchange for being excused from attending field trips.  Dkt. 93-2 at 46–48.

**April 27, 2012:** Ms. Meyers sent an email to IPS Human Resources Supervisor, Sherri Clark, expressing her belief that she was being harassed by Principal Akridge. Dkt. 95-1 at 95.

**June 4, 2012:** IPS ESL Coordinator Marilee Updike sent the following email to HR Supervisor Clark:

> Ok. I have a problem and need your guidance. [Principal] Joyce Akridge called me a while ago and demanded that I move Mary Meyers to another school—because—and I know this—Mary is a pain to work with!!!

4

Of course, I asked why she had not been evaluated out—and Joyce told me she evaluated Mary appropriately. Well, I don't know about that, but here is my problem.

Mary has a 504 that says she has to be in a one story building or one with an elevator. I have told all of the Principals and ESL teachers what their assignments will be for next year—except for those that have not been hired yet but have been recommended—like [Ms. Young] and [Ms. Roberts]??

So what can I do for Joyce? I think she may calm down eventually. Mary probably pushed her last button today and I get that. I really need you to send [Ms. Roberts] over to #79. She will be a great addition. Other than Mary, they have a pretty good little group.

I don't like it when Principals yell at me, but I don't think there is much I can do at this point.…

Why can't Principals evaluate these folks out????????????????????????? I pretty much got stuck with Mary one year when we couldn't find enough teachers.

Depressed on the 5th floor—without a well-deserved 40-year pin!

Dkt. 95-1 at 87–88.

HR Supervisor Clark responded by email on that same day:

Sorry but your email was cracking me up. But thanks for the re-cap—I did miss [Ms. Roberts] although I did not take care of [Ms. Young] and she has accepted. Mary left me an email right before I left but I didn't have the energy to call her back today. Would 49 not be good for Mary? Would Rhonda handle her better? Is that an option? Did Pat get back with you on your pin? I am going to buy you one myself if I have to :).

5

*Id.*

**June 4 – June 8, 2012:** Ms. Meyers submitted her own request to HR Supervisor Clark that she be transferred to another school. Dkt. 95-1 at 97–98. Shortly thereafter, on June 8, 2012, Ms. Meyers was called into Principal Akridge's office, where, according to Ms. Meyers, Principal Akridge inquired about Ms. Meyers's meeting with Clark, raised concerns with regard to Ms. Meyers's grade book, and assigned her a new task involving contacting parents to review and sign certain IREAD paperwork. *Id.*

**June 12, 2012:** Ms. Meyers maintains that on June 12, 2012 she received her first negative performance evaluation in her nine-year tenure with IPS, in which evaluation Principal Akridge assigned her a score of "proficient" in two Domain Categories and "Basic" in two others. [2]

---

[2] Plaintiff cites to "Ex. C-2" in reference to this allegedly negative performance evaluation. Upon review of the record, however, the Court has been unable to locate any such exhibit. At the time Plaintiff filed her Response to Defendants' Motion [Docket No. 95], she attached a single, 117-page exhibit [Docket No. 95-1] containing several delineated markings which subdivided the attachment into Exhibits A through K, but within the alphabetical subdivisions, many documents contained additional numeric markings, while others contained added alphabetical indicia, and some were simply left blank. None contained page numbers in reference to the attachment as a whole or to the alphabetically-divided exhibits, rendering the task of locating the evidence on which Plaintiff relies unnecessarily tedious and burdensome. More than a month later, at Docket Nos. 97 & 98, Plaintiff divided the initial 117-page attachment into eleven separate "exhibits" and submitted them accordingly. However, the newly divided and submitted exhibits were not labeled in the manner consistent with the way they were cited in Plaintiff's briefing, *i.e.*, alphabetically. Instead, six of the eleven new exhibits were given the title "Exhibit Email," while the remaining five received titles such as "Exhibit Deposition Excerpts" and "Exhibit Progress Report." As a result, our evaluation of the present motion was protracted, confusing, and frustrating. Counsel has an obligation to organize and clarify its arguments and materials more successfully than occurred here.

**June 13, 2012:** HR Supervisor Clark notified Ms. Meyers of her reassignment to School #57 for the 2012–2013 school year. Dkt. 95-1 at 100. Following certain concerns raised by School #57's Principal Debra Ashley regarding Ms. Meyers's "commitment as a team player" and whether School #57 was equipped with appropriate elevators to accommodate Ms. Meyers's limited mobility, Ms. Meyers was assigned instead to School #105 for the 2012–2013 school year. At School #105, Ms. Meyers reported to Principal Paula Peterson. Her field trip and breakfast duty accommodations, which had gone into effect while she was at School #79, continued at School #105.

**August 13, 2012:** Ms. Meyers requested a second intermittent leave under the FMLA due to her worsening arthritis and psoriasis as well as injuries sustained in a December 2011 automobile accident. IPS modified the requested leave period (from August 2, 2012–August 2, 2013 to August 13, 2012–June 12, 2013) in order to match the duration of the school year and granted Ms. Meyers's second FMLA leave request. Dkt. 93-2 at 23–27.

**September 6, 2012:** Principal Peterson emailed the new ESL Coordinator, Francisco Valdiosera, inquiring as to whether it would be appropriate for Ms. Peterson to "write up" Ms. Meyers for failing to prepare lesson plans, to which, Mr. Valdiosera responded: "Of course that is appropriate. She is a teacher, and as a teacher must submit lesson plans…." Dkt. 95-1 at 104. Mr. Valdiosera suggested

7

that Ms. Meyers be put in touch with a former ESL teacher from School #105 to discuss ways of preparing lesson plans. *Id.* Principal Peterson responded:

> I was going to skip a few steps and give her a written reprimand because it is stated in our handbook that all teachers must have lesson plans, and I have e-mailed them the information that must be in their plans. She opened the e-mail as the properties show she read the e-mail from me. (sic).

*Id.*

That same day, Principal Peterson also emailed HR Supervisor Clark to ask:

> Do Progressive Discipline issues carry over from one building to another and from year to year? I am just wondering about ESL teacher, Mary Meyers, who was sent to #105 this year. She did not write lesson plans and I was wondering if I have to start with a verbal warning—even though she was at the staff meeting on Aug. 2, 2012 where we discussed the Staff Handbook and lesson plans. Thank you.

Dkt. 95-1 at 103. When HR Supervisor Clark asked whether Principal Peterson possessed any documentation regarding Ms. Meyers's discipline at her previous school, Principal Peterson responded that she did not, but that she had spoken to Principal Akridge, who told her that she had "written [Ms. Meyers] up." *Id.*

Later that day, Principal Peterson completed a Notice of Disciplinary Action in which she issued Ms. Meyers a "verbal correction" regarding her failure to

prepare and submit lesson plans. Dkt. 93-2 at 50–51. A "verbal correction" was, at that time, the lowest level of discipline in IPS's four-tier disciplinary scheme, which consisted of verbal corrections, verbal warnings, written warnings, and written reprimands. *Id.*

**September 7, 2012:** Ms. Meyers received a letter from IPS approving her FMLA leave request of August 13, 2012. Dkt. 95-1 at 51.

**September 10, 2012:** Principal Peterson prepared a second Notice of Disciplinary Action for Ms. Meyers in the form of a "verbal warning" for absenteeism and tardiness regarding her failure to complete the appropriate paperwork prior to taking time off work, resulting in workplace disruptions due to the remaining staff's inability to absorb Ms. Meyers's students into their classes and groups. Dkt. 95-1 at 63–64. This disciplinary notice, however, was not signed by either Principal Peterson or Ms. Meyers. *Id.*

**November 8, 2012:** Ms. Meyers sent an email to HR Supervisor Clark expressing her belief that her reassignment to School #105 placed her in an "impossible situation" due to a poor working relationship with an ESL assistant at School #105 as well as her bad first impression with Principal Peterson. Dkt. 95-1 at 82. Ms. Meyers also noted in the email that she had requested the reassignment as "protection from retaliation," but expressed frustration with her placement at #105, stating: "I don't feel like I deserve this sort of treatment." *Id.*

**November 10, 2012:** HR Supervisor Clark forwarded Ms. Meyers's email to Principal Peterson, explaining to Peterson: "I think we need to have some pretty serious discussions with Mary about not only working well with others but about her professionalism." Dkt. 95-1 at 106.

**November 13, 2012:** Principal Peterson completed a third Notice of Disciplinary Action imposing on Ms. Meyers her "First Formal Warning" for a "Major Offense,"[3] including a three-day suspension, during which period, Ms. Meyers was instructed to report to certain schools within IPS to observe the workplace behaviors and practices of other ESL teachers. Dkt. 95-1 at 65–66. The disciplinary notice indicated that the Formal Warning had been issued in part because of complaints and concerns raised by several families with regard to Ms. Meyers's treatment of her ESL students, accusing her of calling her ESL students both "lazy" and "stupid." *Id.* The notice included a reminder to Ms. Meyers that in September 2012 Principal Peterson and ESL Coordinator Valdiosera had met with her to discuss her abusive verbal attacks on students. The notice indicated further that the suspension was due in part to an incident reported to IPS in which Ms. Meyers had, in violation of school policy, used her cell phone to record students, and to a separate report stating that

---

[3] It appears that as of November 13, 2012, IPS's disciplinary scheme had changed. Under the new framework, a teacher was entitled to a First, Second, and Third "Formal Warning" for any "Minor Offense" before being placed on "Final Warning" status, where any further offense would result in "Discharge." For "Major Offenses," teachers were entitled to only a "First Formal Warning" prior to being placed on "Final Warning" status and being subject to "Discharge." For "Intolerable Offenses," teachers were immediately subject to "Discharge." See e.g. Dkt. 95-1 at 65.

Ms. Meyers had called Principal Peterson a "bitch" in statements to other staff members at the school and had been speaking of Principal Peterson in a derogatory manner. [4] Ms. Meyers served her three-day suspension on November 14, 15, and 16, 2012.

**January 11, 2013:** In response to a disagreement between Ms. Meyers and a colleague, during which encounter Ms. Meyers told the colleague to "make an appointment" if she wanted to speak with her, Ms. Meyers received a written reminder from Principal Peterson and ESL Coordinator Valdiosera that she was expected at all times to show respect to colleagues, students, and staff, informing her that a failure to do so would result in disciplinary action. Dkt. 93-2 at 56.

**March 1, 2013:** Principal Peterson completed a fourth Notice of Disciplinary Action in which she recommended "Discharge" as the appropriate disciplinary action for committing a "Major Offense." Ms. Meyers's "Major Offense" was her failure to properly request a substitute teacher for, or inform the other second grade teachers of, her absence on January 30, 2013, despite having received explicit instruction from Principal Peterson to take such action. Dkt. 93-2 at 57. That same day, Principal Peterson sent Ms. Meyers a letter notifying her that she would be recommending immediate cancellation of Ms. Meyers's teaching contract and that

---

[4] Defendant IPS maintains that on November 13, 2012, Meyers also received a Final Warning for locking herself in her classroom and talking on her telephone while her ESL students were forced to wait outside. Def.'s Mem. at 7. Meyers, however, disputes that she ever received or signed this final warning. Meyers Dep. 109:1–9.

Ms. Meyers could request a private conference with the Superintendent to discuss Principal Peterson's recommendation, which could then be followed by an additional private conference with the School Board. Ms. Meyers was placed on paid suspension effective March 4, 2013, pending a discharge termination by the Superintendent. Dkt 93-2 at 59–60.

**March 3, 2013:** Ms. Meyers filed an Employee Complaint with IPS in which she recounted that certain ESL students had reported to her about a conversation they claimed to have overheard between Principal Peterson and another staff member, during which Principal Peterson said that "[s]he (Meyers) should get off her butt and come down here to get these kids. I wish that I could just sit on my butt too, but I can't, I have to work." Dkt. 95-1 at 74.

**March 29 and April 1, 2013:** Ms. Meyers received letters from IPS Superintendent Peggy Hinckley and IPS Chief of Human Capital Jane Kendrick informing her that upon review of the recommendation to cancel her teaching contract, Superintendent Hinckley had decided to "offer [Ms. Meyers] a last chance to demonstrate compliance with district and school policies and the direction of your principal." Dkt. 93-2 at 61–62. As a result, the recommendation of discharge was rescinded and Ms. Meyers was reinstated to her position at School #105 and placed at the "Final Warning" stage of the IPS progressive disciplinary scheme. *Id.* Ms. Meyers was instructed to return to her position at School #105 on April 8, 2013. *Id.*

**June 5, 2013:** Ms. Meyers submitted her third request for FMLA leave to "deal with pain" for a period beginning in June 5, 2013 and lasting until September 1, 2013. IPS again modified the dates to reflect school's summer break and approved Ms. Meyers's request. Dkt. 93-2 at 29–33.

**June 8, 2013:** Principal Peterson completed a fifth Notice of Disciplinary Action recommending "Discharge" for the "Major Offenses" of "failing to follow directives" and "insubordination" by failing to complete and submit "year-end" documents which had been provided to all faculty on May 15, 2013 and were due by June 4, 2013. The notice stated that Ms. Meyers also reported late to work eleven times in the prior grading period, resulting in a tardiness rate of forty-four percent. Dkt. 93-2 at 63.

**June 17, 2013:** Principal Peterson delivered to Ms. Meyers a letter notifying her that she had reached the preliminary decision to recommend immediate cancellation of her teaching contract with IPS. Principal Peterson's letter outlined Ms. Meyers's disciplinary history beginning in September 2012 and continuing through June 2013 and explained that she was recommending termination due to "insubordination," "neglect of duty," and "other good or just cause."   The letter also included instructions for requesting private conferences with the Superintendent Hinckley and the School Board regarding Principal Peterson's recommendation, should Ms. Meyers desire such.

**June 25, 2013:** Ms. Meyers attended a private conference with Superintendent Hinckley regarding Principal Peterson's second recommendation that her teaching contract be cancelled, after which Superintendent Hinckley recommended to the IPS School Board that Ms. Meyers's teaching contract be cancelled immediately. Ms. Meyers was placed on paid suspension pending a decision by the School Board. Dkt. 93-2 at 81.

**July 11, 2013:** Ms. Meyers submitted her fourth (and final) request for FMLA leave for a period beginning August 1, 2013 and continuing through October 7, 2013, following  back surgery which she underwent in July 2013. Ms. Meyers's final request was not approved in part because, at the time it was submitted, she was on a paid suspension from School #105 pending a decision by the IPS School Board on the recommendation to cancel her teaching contract.

**November 7, 2013:**[5] Ms. Meyers participated in a private conference with the School Board, at which she appeared in person and was represented by counsel. During  the  conference,  the  school  administrators  presented  testimony  from Principal Peterson, Dawn Danglade, Charlene Douglas, Principal Akridge, and Francisco Valdiosera. Ms. Meyers testified on her own behalf. Other evidence was also submitted and received. Dkt. 95-1 at 109.

---

[5] It appears that the School Board private conference was originally scheduled for July 18, 2013, but was thereafter continued on multiple occasions to allow the parties to exchange evidence and prepare their cases as well as to accommodate Ms. Meyers's lengthy paid medical leave of absence. See Dkt. 95-1 at 109.

**November 19, 2013:** The School Board issued its findings and conclusions, holding that the administration had proven by a preponderance of evidence that Ms. Meyers was insubordinate and had neglected her duties as a teacher. Dkt 95-1 at 115. Thus, the School Board voted to immediately cancel Ms. Meyers's teaching contract with IPS. *Id.* at 116.

**The Instant Litigation**

On December 19, 2014, Ms. Meyers commenced this lawsuit following receipt of a notice of right to sue from the Equal Employment Opportunity Commission. Dkt. 1. As previously noted, IPS filed its original motion for summary judgment on November 23, 2015 and its revised motion on October 10, 2016. The substituted motion is now fully briefed and ripe for decision.

## Legal Standard

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the mere existence of some alleged factual dispute between the parties,

*id.* at 247, nor the existence of some metaphysical doubt as to the material facts,

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat

a motion for summary judgment. *Michas v. Health Cost Controls of Illinois, Inc.*, 209

F.3d 687, 692 (7th Cir. 2000).

The moving party bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of the record which it believes

demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears

the burden of proof at trial may discharge its burden by showing an absence of evidence

to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle

for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th

Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the

non-movant, if genuine doubts remain and a reasonable fact finder could find for the

party opposing the motion, summary judgment is inappropriate. *See Shields Enter., Inc.*

*v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*,

870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy

the legal requirements necessary to establish her case, summary judgment is not only

appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324

F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element

necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

16

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. *Seener v. Northcentral Technical Coll.*, 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

## Discussion

Plaintiff alleges three counts against Defendant IPS in her Amended Complaint [Docket No. 22]: disability discrimination (Count I) in violation of 42 U.S.C. § 12112 of the ADA, *id.* at ¶¶ 58–64; failure to restore (Count II), in violation of 29 U.S.C. §§ 2614, 2615 of the FMLA, *id.* at ¶¶ 65–69; and "pervasive discrimination" in the form of a hostile work environment (Count III), in violation of 42 U.S.C. § 12112 of the ADA. *Id.* at ¶¶ 70–74.

Defendant has moved for summary judgment on all three counts, see dkts. 93, 94, but, in responding to Defendant's summary judgment motion, Plaintiff has addressed only two claims: discrimination under the ADA and retaliation under the FMLA, see dkt. 95. We thus interpret Plaintiff's Response as an abandonment of her hostile work

17

environment claim and her FMLA failure to restore claim. We, therefore, <u>GRANT</u>

Defendants' motion with regard to Counts II & III of Plaintiff's Amended Complaint. As

explained below, Plaintiff's recently-advanced claim of retaliation under the FMLA was

not included in her Amended Complaint, having been raised for the first time in her

responsive briefing to Defendant's summary judgment motion. This is too late, and is

thus waived. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012). Accordingly,

we <u>GRANT</u> Defendant's motion with regard to Plaintiff's FMLA retaliation claim.

Plaintiff's remaining claims are addressed below.

## I. ADA Discrimination

Ms. Meyers contends that IPS discriminated against her by terminating her

employment due to her alleged disability.[6] The ADA prohibits employers from

discriminating against a qualified individual on the basis of disability in regard to job

application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of

employment. 42 U.S.C. § 12112(a).

In order to prove a case of discrimination under the ADA, a plaintiff must show:

(1) that she suffers from a disability as defined in the statutes; (2) that she is qualified to

perform the essential functions of the job in question, with or without reasonable

---

[6] Given Plaintiff's concession in her Response to Defendant IPS's argument that many of the "adverse employment actions" she claims to have suffered are either time-barred or not legally actionable, we address her claim of ADA discrimination only as it relates to her discharge from IPS. See Def.'s Mem. at 15–16; Pl.'s Resp. at 10.

accommodation; and (3) that she has suffered an adverse employment action as a result of her disability. *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005); *Martinez v. Ind. Univ. Health, Inc.*, 2013 WL 5775082, at *4 (S.D. Ind. Oct. 25, 2013).

Defendant IPS has challenged Ms. Meyers's claim of discrimination, contending that she has failed to satisfy the third prong of this test because she has not presented facts sufficient for a reasonable jury to conclude that she was discharged as a result of her disability.

Until fairly recently, a plaintiff proceeding under the so-called direct method of proof was required to adduce either direct or circumstantial evidence to show that her employer had a discriminatory motivation. *Collins v. Am. Red. Cross,* 715 F.3d 994, 999 (7th Cir. 2013). Direct evidence is essentially an "admission by the decisionmaker that the adverse employment action was motivated by discriminatory animus." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009). Of course, if the plaintiff was able to provide direct evidence of discrimination in the workplace, she was not required to go any further, for this evidence alone would prove her claim. Given that such "smoking-gun" evidence is exceedingly rare, a plaintiff proceeding under the direct method could instead point to circumstantial evidence, which, when viewed as a whole, establishes that she had been discriminated against based on some proscribed factor. *See Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) *overruled by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). Forms of circumstantial evidence might include: (1) suspicious timing, ambiguous oral or written statements, or behavior

19

toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; or (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination. *Id.* As the Seventh Circuit explained in *Troupe v. May Department Stores Co.*, each type of circumstantial evidence might be sufficient by itself depending on its strength in relation to the other evidence, or it could be used together to "compos[e] a convincing mosaic of discrimination against the plaintiff." 20 F.3d 734, 736–37 (7th Cir. 1994). This particular approach has become known as "the indirect (or 'mosiac') way of *directly* proving [discrimination]." *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012) (Wood, J., concurring) (emphasis added).

Recently, however, in *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit revised its analytical template by eliminating the sub-methodologies and categories of evidence as had existed under the direct method of proof, choosing to replace what the court described as a "rat's nest surplus of 'tests'" with a single issue: "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." 834 F.3d at 766. Under this new, "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular

20

piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.*[7]

Ms. Meyers maintains that, when viewed as a whole, the following evidence proves that her disability was the cause of the termination of her employment on November 19, 2013 by IPS:

1) Principal Akridge's September 6, 2011 statements to Ms. Meyers: "I also have spinal stenosis and am doing lunch duty and have done lunch duty for years. My lunch duty and breakfast duty are two hours each day. Please show me in your paperwork w[h]ere it states you are not required to have duty. Also, how can you circulate the classroom if you cannot stand for longer than five minutes? Our job requires us to move about in the classroom." Dkt. 95-1 at 83.

2) ESL Coordinator Marilee Updike's June 4, 2012 email to HR Supervisor Sherri Clark, in which Updike stated that Principal Akridge had contacted her to demand that Ms. Meyers be transferred to another school because she "is a pain to work with," to which Updike responded with an inquiry as to why Ms. Meyers had not been "evaluated out" and complained that she did not think there was much she could do for Principal Akridge because Ms. Meyers's transferability was limited to only one-story and elevator-equipped buildings, and Updike had already given all of the IPS Principals and ESL teachers their school assignments for the following year, prompting Updike to vent: "Why can't

---

[7] We note that the *Ortiz* court held that its decision did "not concern *McDonnell Douglas* or any other burden-shifting framework," *id.* at 766, but that during the short period of time since that decision, the Seventh Circuit has stated that the straightforward inquiry in *Ortiz* has, indeed, "replaced the notion of two distinct *methods of proof* – the 'direct' and 'indirect.'" *Harris v. Office of the Chief Judge of the Circuit Court of Cook Cnty.,*—Fed. Appx.—, 2016 WL 7228703, at *2 (7th Cir. Dec. 13, 2016) (emphasis added). Though we struggle to reconcile the Seventh Circuit's clear preference for a single, simplified approach in analyzing claims of discrimination with the continued existence and applicability of the Supreme Court's directives in *McDonnell Douglas*, this case does not implicate the incongruity between the two tests, given that Ms. Meyers has made no attempt to present a so-called prima facie case in order to prove her claim indirectly through comparison to employees outside her protected class.

Principals evaluate these folks out??????????????????????????" Dkt. 95-1 at 87–88.

3) HR Supervisor Clark's responsive email of June 4, 2012: "Sorry but your email was cracking me up…Mary left me an email right before I left but I didn't have the energy to call her back today. Would 49 not be good for Mary? Would Rhonda handle her better? Is that an option? Did Pat get back with you on your pin? I am going to buy you one myself if I have to :)." *Id.*

4) The fact that in November 2012 HR Supervisor Clark forwarded to Principal Peterson an email that Ms. Meyers had sent to Clark regarding her displeasure with being assigned to Principal Peterson's school, School #105. Dkt. 95-1 at 106.

5) Principal Peterson's hearsay comment on March 3, 2013: "She (Meyers) should get off her butt and come down here to get these kids. I wish that I could just sit on my butt too, but I can't, I have to work." Dkt. 95-1 at 74.

See Pl.'s Resp. at 11 (appearing as listed).

On whole, Plaintiff's proffer falls well short of the required mark to establish wrongful discrimination under the ADA, and in particular that it led to her unlawful discharge. Summary judgment is often referred to as the "put up or shut up" moment in a case because it is at this point in the litigation that the plaintiff is required to present all the evidence she contends is available to prove her case. Importantly, the proffered evidence must be evidence on which a reasonably jury could rely in reaching the plaintiff's desired conclusion. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Ms. Meyers's evidence, jointly and severally considered, is not of that kind. Perhaps the most obvious weakness lies with Ms. Meyers's strongest contention.

Ms. Meyers contends that Principal Peterson publicly chided her for sitting on her "butt" while others "ha[d] to work." Pl.'s Resp. at 11 (citing Dkt. 93-2 at 74). We do not disagree with Ms. Meyers that a reasonable jury could interpret such a comment as exhibiting animus towards her due to her disability and accommodations; however, as reported here, this statement is hearsay upon hearsay. Ms. Meyers has presented no basis on which this statement could even be admitted at trial, never mind a basis evidence on which a jury could conclude that such a comment was or became the reason for her termination. Indeed, her evidence consists of nothing more than her Employee Complaint Form in which she reports on a conversation between herself and some of her ESL students, in which conversation the ESL students told of a conversation they overheard between Principal Peterson and an unnamed staff member. See Dkt. 93-2 at 74. When offered for the truth of the matter (as Plaintiff clearly attempts to do), this completely uncorroborated account written by Ms. Meyers herself is inadmissible hearsay within hearsay. See Fed. R. Evid. 801(c). Rule 56 requires more than speculation and bald assertions of fact; at this stage in the litigation the parties must come forward with competent evidence of a type otherwise admissible at trial. Fed. R. Civ. P. 56. Because Ms. Meyers has failed to provide any competent and admissible evidence with regard to her claim that Principal Peterson even made the above-quoted remarks, we cannot consider them in our review of her discrimination claim.

This leaves the September 2011 comment by Principal Akridge regarding lunch duty and the June 2012 email exchange between ESL Coordinator Updike and HR

Supervisor Clark regarding Ms. Meyers's eventual transfer from School #79 to School #105. Even interpreting these comments in a light most favorable to Plaintiff, they fail to support an inference that Ms. Meyers's discharge by the IPS School Board in November 2013 was motivated by its discriminatory animus. Isolated comments such as these must give rise to an inference of discrimination; thus, typically, they must (1) be made by a decisionmaker, (2) around the time of the decision, and (3) in reference to the adverse employment action. *See Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) *overruled by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) *to the extent it relied on the direct/indirect paradigm.* No single comment must, by itself, satisfy all three criteria in order to adduce an inference of discrimination; rather, they may all be viewed in combination with one another. Plaintiff's main problem here is that none of these above-mentioned comments satisfies any of the three elements.

Plaintiff's own version of the facts makes clear that neither Principal Akridge, ESL Coordinator Updike nor HR Supervisor Clark was a decisionmaker when it came to Meyers's discharge decision. Indeed, Principal Akridge was the only one ever to hold a position in which she had the authority to discipline Ms. Meyers, initiate the progressive disciplinary scheme, or recommend her discharge to the Superintendent. It was the Superintendent who had the power to recommend discharge to the School Board. The record reflects that Ms. Meyers's disciplinary record was apparently at one point reset following her transfer from Principal Akridge's school to Principal Peterson's, when Principal Peterson restarted Ms. Meyers at the "verbal correction" stage of the IPS

disciplinary scheme upon her first infraction at School #105 in 2012—a year after Principal Akridge made the above-quoted remark and a year prior to the School Board's decision to cancel Ms. Meyers's teaching contract.[8] Dkt. 93-2 at 50–51. Moreover, Ms. Meyers has made no attempt whatsoever to explain what role, if any, ESL Coordinator Updike or HR Supervisor Clark played in the IPS School Board's decision to terminate her teaching contract. In fact, it appears from the proffered email exchange that ESL Coordinator Updike was frustrated by the fact that neither she nor Clark had the ability to affect evaluations of low-performing teachers. See Dkt. 95-1 at 87–88. Thus, even after interpreting their email exchange in the light most favorable to Ms. Meyers, we find no decisional connection between it and the IPS School Board's action.

Ms. Meyers has also invoked what she characterizes as suspicious timing, maintaining that she "had eight years of good reviews with almost no discipline. Then she made her ADA and FMLA requests, and within two years was written up multiple times and terminated." Pl.'s Resp. at 13. Contrary to Ms. Meyers's claim, a close review of the facts relating to the timing of her disciplinary notices and eventual termination does not reveal any basis from which to infer discrimination. Many of the eight years for which she claims to have received satisfactory performance reviews were spent in a support staff position, and many of the reasons given for her eventual termination— including, *inter alia*, her failure to prepare lesson plans, her mistreatment of students, and

---

[8] In fact, Ms. Meyers also dodged the termination "bullet" in March/April 2013, when she received a "last chance" opportunity to remain a teacher if she demonstrated compliance with district and school policies, despite Principal Peterson's recommendation to the Superintendent that she be discharged for committing a "Major Offense."

her refusal to abide by the procedures in place for securing substitute teachers—relate to the duties of teachers. In other words, her satisfactory performance in one position does not equate with or prove satisfactory performance in another. In any event, Ms. Meyers's teaching evaluations, which were completed by different supervisors at different schools within IPS prior to her assignment to School #105, where she was supervised by Principal Peterson, lack relevance in our determination of whether the discipline she received from Principal Peterson, leading to the recommendation of discharge, was legitimate or discriminatory. *See Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 600 (7th Cir. 2010); *Zayas v. Rockford Mem. Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014). Ms. Meyers has presented no admissible evidence that Principal Peterson was influenced by any discriminatory animus in issuing her five separate Notices of Disciplinary Action, along with the written reminder of decorum and professionalism, all between September 2011 and June 2012, nor has she offered any evidence that Superintendent Hinckley or any member of the School Board possessed a discriminatory intent based on her disability or any other impermissible factor. The fact that she received satisfactory performance evaluations in prior years from prior supervisors compared to her unsatisfactory performance evaluations in her final year does not raise a suspicion sufficient to establish or suggest a discriminatory motive.

In the final analysis, Ms. Meyers has presented the court only with allegations that she was discharged by the IPS School Board due to her alleged disability, but at summary judgment, a party must go beyond allegations by presenting competent, admissible, and

26

relevant evidence which would permit a reasonable factfinder to reach that conclusion. Because Ms. Meyers has failed to support her allegations of discrimination with this type of competent evidence, we <u>GRANT</u> Defendant's motion for summary judgment on her ADA discrimination claim.

### II. FMLA Retaliation

As previously mentioned, Ms. Meyers responded to Defendant's motion for summary judgment by arguing that IPS's cancellation of her teaching contract was also motivated by her use of the Family and Medical Leave Act, see Pl.'s Resp. at 12, pointing to the fact that Principal Akridge and Principal Peterson both gave her poor performance reviews shortly after she made requests for leave under the FMLA.

Defendant correctly asserts that Ms. Meyers did not plead an FMLA retaliation claim in her Amended Complaint [Docket No. 22], but instead pled a "Failure to Restore" claim in which she alleged that "[a]fter Ms. Meyers' Family Medical Leave, IPS failed to restore Ms. Meyers to [the] position of employment held by Ms. Meyers when the leave commenced." Pl.'s Am. Compl. at 8, Count II. These claims are not one and the same, and it was the failure-to-restore claim that Defendant addressed in its summary judgment motion and which Plaintiff failed to address in her response, replacing it with the new theory of retaliation. Because Plaintiff chose not include an FMLA retaliation claim in her Amended Complaint, she has waived any such claim. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012). It is neither sufficient nor permissible for Ms. Meyers to assert these claims for the first time in her response to IPS's motion for summary

27

judgment. *See Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) ("a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

This case was filed on June 12, 2014, giving Plaintiff until December 1, 2014 to amend her pleadings according to the parties' approved case management plan. See Dkt. 18. We granted Ms. Meyers's request for additional time to file an Amended Complaint by December 19, 2014, which now appears at Docket No. 22 and serves as the governing pleading in this case. The December 2014 Amended Complaint did not include a claim of FMLA retaliation; thus, when Defendant was first presented with Plaintiff's FMLA retaliation arguments, in response to its motion for summary judgment, it was deprived of the fair notice of Plaintiff's claims required by the federal pleading rules. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). IPS need not defend against these belated claims. Thus, summary judgment shall enter in its favor on Plaintiff's FMLA allegations.

## Conclusion

For the reasons detailed above, Defendant IPS's Motion for Summary Judgment [Docket No. 93] is <u>GRANTED</u> in all respects. Final Judgment shall enter accordingly.

IT IS SO ORDERED.

Date: _6/14/2017_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

28

Distribution:

Craig M. Borowski
FAEGRE BAKER DANIELS LLP (Indianapolis)
craig.borowski@faegrebd.com

Ryann E. Ricchio
FAEGRE BAKER DANIELS LLP - Indianapolis
ryann.ricchio@faegrebd.com

Paul Stanton Petro
PETRO LAW
paul@petrolaw.us